UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――

DAVID M. ZACHER,

            Petitioner,

     -vs-

HAROLD GRAHAM, Superintendent,
Auburn Correctional Facility,
Auburn, New York,

            Respondent.

**DECISION AND ORDER
No. 6:14-CV-06027(MAT)**

―――――――――――――――――――――――

## INTRODUCTION

Represented by counsel, David M. Zacher ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently serving an aggregate prison term of life without parole in Respondent's custody. He is incarcerated pursuant to a judgment entered May 26, 2006, in New York State Supreme Court, Monroe County (Valentino, J.), convicting him, after a jury trial, of two counts of Murder in the First Degree (New York Penal Law ("P.L.") §§ 125.27(a)(vii), (b))[1] and one count of Assault in the First Degree (P.L. § 120.10(a)).

---

[1]

P.L. § 125.27(a)(vii) and (b) apply when, inter alia, the victim "was killed while the defendant was . . . in the course of and furtherance of immediate flight after attempting to commit the crime of murder in the second degree . . . [and] the victim is not a participant in one of the aforementioned crimes[,]" N.Y. PENAL LAW § 125.27(a)(vii), and the defendant is older than 18 years. Id. § 125.27(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Petitioner's Trial

The convictions here at issue stem from an incident on April 8, 2005, in which Petitioner was alleged to have fatally stabbed his wife and four-year-old daughter, H.Z., and to have inflicted life-threatening stab wounds on his two-year-old daughter, E.Z., at the family's home in Greece, New York.

#### A.   The Prosecution's Case

##### 1. The 911 Call

On Friday, April 8, 2005, at about 7:15 p.m., officers from the Town of Greece Police Department responded to a 911 call from a person named "David" located at 250 Cameron Hill Drive. "David" told the 911 operator, "I just hurt my family," T.3326-28, 3355-56, and that "they got stabbed." T.3407.[2] The 911 operator asked Petitioner if he "hurt them," and Petitioner began crying and saying over and over, "Oh my God, I'm so sorry." SR.122-23. When the police arrived at Petitioner's house, they found the body of H.Z. lying in the dining area of the kitchen; she had sustained several sharp force wounds to her abdomen and across her chest, and her intestines protruded through an abdominal laceration. T.3993-95. Efforts to revive H.Z. were unsuccessful and she was pronounced

---

[2]

    Citations to "T." refer to pages from the transcript of Petitioner's trial. Citations to "S." refer to pages from the transcript of Petitioner's sentencing proceeding. Citations to "SR." refer to pages in the state-court appellate record, submitted as a separately-bound exhibit by Respondent in connection with his response to the petition.

dead at Park Ridge Hospital at 7:40 p.m. Karelin, Petitioner's wife, was lying in the hallway with a large knife with a broken handle embedded in the front of her torso.    Karelin had no discernable pulse and was not breathing; CPR was impossible because she had lost too much blood. T.3960-67. She was pronounced dead that night by an investigator from the Monroe County Medical Examiner's Office. T.6465-73. The police found Petitioner, sitting cross-legged on the kitchen floor in his undershorts and socks, holding E.Z., whose heart, lung, and intestines were visible through a "slashing type injury" to her torso inflicted by a sharp object. T.4158-61, 4134-37.

The police approached Petitioner, who was crying and holding E.Z. in his arms, and ordered him to put her down. The child was rushed to the hospital where she underwent emergency surgery. E.Z.'s spleen and diaphragm were able to be repaired, but because the injury to her lower left lung was "too deep and too extensive," the surgeon was required to remove the damaged section of the lung. T.4154-56.

Meanwhile, the police, still unsure if Petitioner was a suspect or a victim, placed him in handcuffs and transported him to the Town of Greece Police Department station, where he was placed in a holding cell. T.3457-60, 4917-18.

### 2.    Petitioner's Custodial Statements

When Sergeant Theodore Bielowicz ("Bielowicz")[3] first encountered Petitioner at the police station, Petitioner was lying on his stomach on a bench in a holding cell, his hands were handcuffed behind his back, and he was dressed only in white briefs and white socks. Bielowicz introduced himself, told Petitioner to sit up, and removed Petitioner's handcuffs. T.5906-09, 6076. In response to Bielowicz's question whether he had been injured, Petitioner said yes, and turned his palms upward to show a cut on the inside of his right hand. T.5910-11. There was a laceration across the middle of Petitioner's fingers, running parallel to the knuckle creases. T.5671, 6076. Petitioner also had a bleeding cut on his right palm near his wrist. T.5672.[4] Petitioner's hand wound was photographed by Officer Mark Sundquist at Bielowicz's request, and Petitioner was provided medical treatment. T.5935-36. Bielowicz provided Petitioner with a pair of his blue police uniform pants, a gray T-shirt and shirt, and a pair of black socks. T.5945. Bielowicz asked Petitioner to give him his underwear and socks, which Petitioner did, and then Petitioner put on the clothes given to him by Bielowicz. T.5946-47.

---

[3]

Petitioner also made custodial statements to a different police officer and to a child protective services case worker, but these statements are not at issue in this proceeding.

[4]

Scott LaPoint, M.D., who performed the autopsies on Karelin and H.Z., testified that the lacerations were consistent with Petitioner's hand having slipped down a knife blade. T.7665-66.

Bielowicz told Petitioner that he needed to speak with him, to which Petitioner responded, "Okay." T.5948. On the way to the second floor to an interview room, Petitioner was asked whether he wanted anything to eat or drink or needed to use the bathroom. T.5949-50. At first, Petitioner did not respond, but as they walked toward the interview room, Petitioner asked for, and was given, some water. T.5952-54.

In the approximately nine-by-ten-foot interview room, there was a desk, two chairs, a computer, and an air purifier. Bielowicz sat in the chair on the long side of the desk facing the wall, and Petitioner sat to Bielowicz's left, about a foot to a foot-and-a-half away in the chair on the short side of the desk. T.5955-60.

Bielowicz told Petitioner that before he talked to him, he would have to advise him of his <u>Miranda</u>[5] rights. T.5960. Bielowicz began to fill out a card preprinted with the <u>Miranda</u> warnings, and he asked Petitioner some pedigree questions. T.5963. In response, Petitioner provided his name and date of birth; with regard to his educational background, Petitioner stated that he held a master's degree. T.5964. After Bielowicz read the <u>Miranda</u> warnings from the card, T.5965-68, he asked Petitioner, "'Do you understand what I have just said to you?'" Petitioner replied, "'Yes.'" T.5968. Bielowicz asked, "'Do you agree to give up your rights and talk with me now?'" <u>Id.</u> Petitioner replied, "'Yeah, okay.'" <u>Id.</u>

---

[5]     <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).

Bielowicz next asked Petitioner, "'What happened in the home tonight?'" T.5969, 5972. Petitioner stated, "'I don't want to talk about it." T.5973.

Bielowicz's next question to Petitioner was "if he worked or if he worked that day." T.5974. Petitioner said he worked in sales at the Trec Company in Medina. T.5976-77. Petitioner said that he left work at 2:00 p.m. to attend a parent-teacher meeting with his wife. T.5977-79. Bielowicz asked him what he did after the conference, and Petitioner said "[t]hey went home." T.5980. Bielowicz asked Petitioner if he had dinner that evening, Petitioner said that they had fish fries from Wegmans. T.5981.

Bielowicz then asked Petitioner what had happened after they had dinner, and Petitioner said he wanted to go hit golf balls with his son, T.Z., at a driving range. T.5981-82. Petitioner and Bielowicz briefly discussed T.Z. and golf. Bielowicz next asked Petitioner if they did go hit golf balls, and Petitioner said "his wife didn't want him to go." T.5982-83. Bielowicz said that Petitioner, not in response to any question, said "[h]is wife started to yell at him." T.5983. Bielowicz asked him "[w]hat was she saying[,]" and Petitioner "started crying." T.5984. Bielowicz left the interview room to get tissues. When Bielowicz returned, he handed the tissues to Petitioner, who "had his face in his hands" and "was crying." T.5984. About 20 to 30 seconds later, Petitioner stopped crying and stated, not in response to any question, "I

shouldn't of [sic] hurt them." T.5985, 6272.   Bielowicz asked,
"'How did they get hurt?" Id. Petitioner replied, "'I don't know.'"
T.5986. Bielowicz then asked, "'Who is hurt?'" Id. Petitioner
stated, "I didn't mean to hurt them." Id. Bielowicz asked
Petitioner, "'Who did you hurt?'" Petitioner said, "'I shouldn't of
[sic] hurt my daughters.'" Id. Bielowicz then asked, "'How did you
hurt them?'" T.5987. The prosecutor asked Bielowicz if Petitioner
gave a direct answer to that question, at which point defense
counsel objected and the jury was excused. See T.5987-94. When the
proceedings resumed, the prosecutor asked Bielowicz if he asked
Petitioner any more questions, to which Bielowicz replied, "No[.]"
T.5994-95.

### B.   The Defense Case

#### 1.   Petitioner's Testimony

Petitioner testified that he did not know whether he had hurt
or stabbed his family; instead, he assumed that he was responsible
for the attacks on his wife and daughters because he "wasn't aware
of anybody else being in the house so [he] just assumed that it
must have been [him]." T.8573-74. Petitioner stated that he has
been unable to recall anything that happened during the time period
in which his wife and daughters were attacked. T.8557, 8708, 8713,
8948-49, 8958, 8971.

After he and his family had finished dinner on the night of
April 8, 2005, Karelin asked, "What should we all do now?" T.8543.

When Petitioner responded that she knew he already had plans to take T.Z. to the driving range, Karelin replied, "no, you're not." T.8543. Petitioner went upstairs and asked T.Z. if he was ready to go to the driving range. During this time, Karelin was watching television in the family room with H.Z. and E.Z. T.8533, 8544, 8686. When Petitioner returned downstairs, he again argued with Karelin about taking T.Z. to the driving range; Karelin called him "selfish" and said she had already forbidden him from taking T.Z. out. T.8542, 8544, 8700. After getting drinks for himself and T.Z. to take with them, Petitioner told T.Z. to get his coat and wait in the car. As Petitioner walked toward the coat room, Karelin confronted him again about taking T.Z. out, noting that T.Z. had been sick earlier in the week and had a party to attend the next day. T.8550, 8689, 8701. As they argued, Karelin pointed her right index finger in Petitioner's face and called him "irresponsible" and "stupid" and said he was an "idiot" and an "asshole." T.8551, 8690, 8700-02, 8705, 8731, 8933. Petitioner told Karelin to take her finger out of his face, and she proceeded to hit him on the left side of his head with an open hand. T.8555-56, 8701, 8708. Petitioner said they had never struck each other before, although she had once thrown a laundry basket at him. T.8554-55, 8891, 8933, 8935.

Petitioner testified that the next thing he could remember was standing at the top of the stairs. T.8557, 8708, 8713, 8948-49.

-8-

When he realized his right hand was bleeding, he removed his T-shirt, balled it up and wrapped it around his hand. T.8559, 8746. Petitioner related that he then proceeded to gather up some of Karelin's jewelry and some $100 bills, which he placed in a plastic J.C. Penney bag. Petitioner testified that he was "confused and disoriented" and did not have a "real reason" for doing this other than that he was "concerned" that "somebody was going to take them" and that Karelin's valuables "couldn't be replaced." T.8564, 8936-37. He went into the master bathroom and ran water for about a minute over his bleeding right hand. T.8559. He then wrapped his hand again in a shirt. T.8752. After noticing blood on his pants, he took a clean pair out of the closet; after bleeding on that pair, he took off his pants and socks and put on clean socks. T.8561-63, 8754-55. He took a plastic garbage bag out of a drawer and put his bloodied T-shirt in it. T.8764. After about 5 minutes had elapsed, he returned downstairs in his socks and underwear, carrying a clean pair of jeans and the J.C. Penney bag.  T.8768. Turning the corner into the kitchen, he saw Karelin and H.Z. lying on the floor. T.8563-65. Petitioner said it was "obvious" to him that they had been stabbed, and he was "fairly certain" they were dead. T.8573, 8956. Petitioner, who admitted he was trained in CPR, testified that it did not occur to him to render any first aid assistance to them. T.8778-79, 8938, 8950. Upon realizing T.Z. was

waiting for him, he went into the garage and told T.Z. to go down the street to his uncle's house. T.8569-70.

Petitioner then went back into the house and called 911, and sat down on the floor. T.8570-72. He admitted that he told the 911 operator that he had "just hurt [his] family." T.8572. While on the phone with 911, Petitioner saw E.Z. move; he dropped the phone, picked her up, and began apologizing to her. T.8574-76. When the police arrived, he told them he was fine and that they needed to help E.Z. T.8581. Petitioner said that the police handcuffed him and brought him to the station.

Petitioner's testimony about the interrogation with Bielowicz largely was consistent with Bielowicz's testimony. However, Petitioner denied telling Bielowicz that he should not have hurt his daughters. T.8603-04, 8812, 8948. Petitioner explained that he told Bielowicz that he did not want to talk about what had happened because he was "too emotional." T.8948. Petitioner also testified that Bielowicz asked him whether he was Catholic, and when he responded affirmatively, Bielowicz told him that he must know "confession" is a "good thing." T.8613. Petitioner said that Bielowicz told him he had visited the house and saw "what happened," and he advised Petitioner to "confess[ ] to what [he] did." T.8613.

### 2.    The Defense Expert

Rajendra Singh, M.D., an expert in forensic psychiatry, was retained by defense counsel to render an opinion on Petitioner's mental state during the stabbings, based on the assumption that Petitioner had perpetrated the attacks. T.8792, 8992, 9002-05, 9109-10, 9163. Dr. Singh opined that on the night of the incident, Petitioner entered a "dissociative state" during the stabbings. T.9006-07, 9012-13, 9116-17, 9133. According to Dr. Singh, "[c]ertain people, under extreme emotional stress, can go into a [dissociative] state where their mind is not working as it normally it does." T.9007. Dr. Singh diagnosed Petitioner as having experienced a "[d]issociative disorder, not otherwise specified," when he stabbed his wife and daughters. T.9104. According to Dr. Singh, while in this dissociative state, Petitioner would not have been able to make a conscious decision to kill or injure wife and daughters. T.9161-62. Dr. Singh characterized Petitioner's mental state as an "emotional frenzy" during which he "did not know what he was doing and did not know the consequences." T.9015-16; see also T.9013-14 ("It appeared to me that he was in a confused state of mind because he went from being a loving, caring father to like a bulb switch flipped. He hurts his family and then when he comes to realization he calls 911."). Dr. Singh believed Petitioner reacted in anger to Karelin during their argument and acknowledged that angry people can make choices "most of the time," T.9116-17,

9094, but he did not believe Petitioner was in this category of people. T.9161-62. After the event, Petitioner developed dissociative amnesia, T.9012-13, which Dr. Singh described as "forgetting in response to a trauma," T.9225. Dr. Singh opined that Petitioner was not malingering about the persistence of his amnesia. T.9013-14.

### C.   The Prosecution's Rebuttal Expert

Psychiatrist J. Richard Ciccone, M.D. agreed with Dr. Singh that "at some point" "after the events[,]" Petitioner "did develop a dissociative amnesia[.]" T.9226-28. However, Dr. Ciccone stated, dissociative amnesia is usually a "transient condition" that lasts for a "few minutes" and "lifts spontaneously." T.9241-42, 9394, 9396. Dr. Ciccone testified that he was unable to rule out the possibility that Petitioner was malingering about the persistence of his amnesia. T.9225, 9228-29, 9394-95.

Dr. Ciccone also disagreed with Dr. Singh's opinion that, at time of crime, Petitioner was suffering from dissociative disorder, NOS. T.9230. According to Dr. Ciccone, there was "insufficient data" to support a diagnosis of dissociative disorder, NOS. T.9230-31. Instead, in Dr. Ciccone's opinion, there was only "the argument, . . . the slap, and then . . . the gruesome scene." T.9232. Dr. Ciccone noted that "with dissociative disorder, you have some history of a person having that kind of episode before," but here, there was "[n]o history of that." T.9230. Dr. Ciccone

disagreed with Dr. Singh's conclusion that Petitioner was suffering from a dissociative state based on the absence of some logical explanation for Petitioner's extreme and uncharacteristic acts. T.9235-36. Dr. Ciccone stated that "[p]eople do uncharacteristic things, and in the setting of domestic violence and terrible things happening[,] . . . terrible things can occur, and it's not because someone went into a [dissociative] trance." T.9236.

### D.   The Verdict and Sentence

On March 18, 2006, the jury returned a verdict convicting Petitioner as charged in the indictment. The jury rejected Petitioner's defense of "not responsible by reason of mental disease or defect." See T.9864-68.

On May 26, 2006, Petitioner appeared for sentencing. His motion to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30 was denied by Judge Valentino in a written decision that was handed down at the sentencing hearing. S.21. Petitioner then was sentenced to a term of life without parole on each of the two first-degree murder convictions, those sentences to be served concurrently. Petitioner was sentenced to a determinate term of 25 years in prison on the assault conviction, to be served consecutively to the foregoing sentences. See S.69-72.

## II.  Petitioner's Direct Appeal

The Appellate Division, Fourth Department, unanimously affirmed Petitioner's conviction on direct appeal, and the New York

Court of Appeals denied leave to appeal. <u>People v. Zacher</u>, 97 A.D.3d 1101 (4th Dep't 2012), <u>lv. denied</u>, 20 N.Y.3d 1015 (2013).

## III. **The Federal Habeas Proceeding**

In his timely-filed habeas petition, Petitioner asserts the following grounds for relief: (1) the trial court erred in denying his motion to suppress his custodial statement to Bielowicz ("Habeas Claim One"); and (2) the trial court erred in permitting the prosecution to present evidence of Petitioner's invocation of his right to remain silent ("Habeas Claim Two"). <u>See</u> Petition ("Pet.") (Dkt. #1-1), ¶ 10. Respondent answered the petition and filed a memorandum of law in opposition, arguing that Claim One is exhausted, but meritless, and that Claim Two is unexhausted but must be deemed exhausted and procedurally defaulted and is, in any event, meritless.  Petitioner filed a reply memorandum of law.

For the reasons discussed below, the Court finds that Claim Two is unexhausted but must be deemed exhausted and procedurally defaulted. The Court also finds no basis to excuse the procedural default. With regard to Habeas Claim One, which Respondent concedes is fully exhausted, the Court finds that any <u>Miranda</u> error was harmless because it did not have substantial and injurious effect on the verdict. Therefore, the Court concludes, habeas relief is not warranted.

**EXHAUSTION**

## I.   General Legal Principles

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court." O'Sullivan v. Boerckel, 526 U.S. 838 (1999) (citing 28 U.S.C. §§ 2254(b)(1), (c)). For purposes of the habeas statute's exhaustion requirement, petitioners in New York must "invoke 'one complete round of the State's established appellate review process.'" Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (quoting O'Sullivan, 526 U.S. at 845), cert. denied, 544 U.S. 1025 (2005). In New York, a "complete round" of appellate review means that a petitioner "must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." Id. at 74 (quotation omitted; citing N.Y. CRIM. PROC. LAW § 460.20; other citation omitted).

In determining whether a petitioner "has *properly* exhausted [his] remedies," O'Sullivan, 526 U.S. at 848 (emphasis in original), the habeas court must ask whether he has fairly presented his claims to the state courts," id. (emphasis omitted); see also, e.g., Galdamez, 394 F.3d at 73. In order to "fairly present" constitutional claims, "[t]he petitioner must apprise the highest State court of both the factual and the legal premises of the federal claims ultimately asserted in the habeas petition."

Galdamez, 394 F.3d at 74 (citing Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997)).

## II. Analysis

### A. Whether the "fair presentation" requirement is satisfied

In his Appellate Division brief, Petitioner asserted five "Questions Presented," SR.010, the third of which was "[w]hether the People should have been permitted to elicit testimony—both in their direct case and on cross-examination of Mr. Zacher—that Mr. Zacher had told police, while in their custody, that he did not want to talk about the fatal incident." Id. This corresponds to Habeas Claim Two, which Respondent claims is unexhausted. Petitioner then presented argument regarding this "question presented" in Point III of his Appellate Brief. See SR.032-042 ("The [trial] [c]ourt committed reversible error by allowing the People to present extensive testimony on Mr. Zacher's exercise of his constitutional right to remain silent."). Respondent does not dispute that Petitioner framed this issue in Federal constitutional terms before the Appellate Division.

Rather, Respondent contends that Petitioner failed to fairly present Habeas Claim Two at the next level of appellate review, because appellate counsel did not include it in the letter seeking permission to appeal (SR.511-520) ("the Leave Letter") to the New York Court of Appeals. According to Respondent, Petitioner did not identify Claim Two as an issue on which he sought review by

-16-

that court, contrary to New York Court Rules which require that leave applicants must "indicate [in the leave letter] . . . the grounds on which leave to appeal is sought[.]" N.Y. Cᴛ. R. § 500.20(a)(4). See also Galdamez v. Keane, 394 F.3d 68, 74 & n. 4 (2d Cir. 2005) (discussing similar requirement under former version of N.Y. Court Rules). The Court agrees, as discussed further below.

At the beginning of the Leave Letter, appellate counsel stated, "[b]elow is a written submission in support of [Petitioner]'s application for leave to appeal." SR.511. The written submission referenced four issues, each of which was set out in bold-faced type, followed by argument. The first three bold-faced headings were numbered as "Issue 1," "Issue 2," and "Issue 3," but the fourth heading was not numbered. The Court will refer to the last heading as "Issue 4."

Both Issue 1 and Issue 4 were newly raised and had not been asserted before the Appellate Division.[6] Issue 3 asserted a claim that, like Issues 1 and 4, has not been included in Petitioner's habeas petition, i.e., that the jury should have been given an adverse inference charge based on the police department's decision not to electronically record their interrogation of him. Issue 2,

---

[6]

Issue 1 asserted that the Appellate Division improperly "avoided exercising its unique fact-finding review power" and "deprived [Petitioner] of full appellate review of the trial court's suppression determination." Issue 4 asserted that the Appellate Division "was wrong to determine that the evidence of guilt was overwhelming."

which corresponds to Habeas Claim One, asserted that the trial court erred as a matter of law in determining that Petitioner did not assert his <u>Miranda</u> right to cut off questioning. However, there is no heading in the Leave Letter that corresponds to Habeas Claim Two, which had been raised as Point III of his Appellate Division brief.

Petitioner argues that this Court should construe the Leave Letter to have raised Habeas Claim Two, because appellate counsel mentioned that the suppression court's ruling "'allowed extensive trial testimony that [Petitioner] told police that he did not want to talk about what had happened in his home that evening.'" Petitioner's Memorandum of Law (Dkt. #1-1 at 18) (quoting SR.516)). The Court agrees that this statement generally references the underlying factual basis for Habeas Claim Two. However, this passing reference to the introduction of testimony regarding Petitioner's invocation of his right to remain silent contrasts sharply with the extensive argument presented on the other issues raised in the Leave Letter. It also contrasts with the thorough manner in which he presented Habeas Claim Two in Point III of his Appellate Division brief, in which he relied on <u>Wainwright v. Greenfield</u>, 474 U.S. 284 (1986), and <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976), <u>see</u> SR-32. No legal argument and none of the cases cited in support of Habeas Claim Two were included in the Leave Letter. For all of these reasons, the Court concludes that the Leave Letter's

substance did not sufficiently alert the Court of Appeals that Petitioner sought appellate review of Habeas Claim Two. See, e.g., Jordan v. Lefevre, 206 F.3d 196, 198-99 (2d Cir. 2000) (holding that petitioner had not fairly presented his claims to Court of Appeals when leave letter accompanying appellate briefs argued "a single claim at length and [made] only [a] passing reference to possible other claims to be found in the attached briefs"). Furthermore, Petitioner did not include a catch-all statement requesting review of "all issues" raised in the Appellate Division, which has been held sufficient to alert the Court of Appeals that review of issues not mentioned specifically in the leave letter is requested.[7] Although Petitioner stated that he had "[e]nclosed . . . the briefs and appendix . . . submitted to the Appellate Division[,]" SR.511, that was not sufficient to alert the Court of Appeals that he sought review of Habeas Claim Two given that he specifically addressed multiple other issues to the exclusion Habeas Claim Two in the Leave Letter. See, e.g., Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991) (petitioner argued a single claim in leave letter and attached appellate brief that contained two other claims, which were not mentioned in leave letter; leave letter did

---

[7]

E.g., Morgan v. Bennett, 204 F.3d 360, 370-71 (2d Cir. 2000) ("Morgan's initial letter to the Court of Appeals expressly 'request[ed] this Court to consider and review all issues outlined in defendant-appellant's brief and pro se supplemental brief' submitted to the Appellate Division. That statement was sufficiently specific to alert the Court of Appeals that Morgan sought review of all of the issues raised in his pro se supplemental Appellate Division brief.") (internal citation to record omitted; brackets in original).

not adequately present the other two claims to the state's highest court).

Under the circumstances described above, the Court finds that Petitioner did not "fairly present" Habeas Claim Two to the Court of Appeals. Therefore, the Court must find that Petitioner did not properly exhaust Habeas Claim Two.

**B.   Habeas Claim Two is unexhausted but must be deemed exhausted and procedurally defaulted.**

An unexhausted claim will be "deemed exhausted" when a petitioner has no available method of exhausting it in State court. Grey v. Hoke, 933 F.2d at 120 (citing, inter alia, Castille v. Peoples, 489 U.S. 346, 351 (1989) (finding that "[t]he requisite exhaustion may nonetheless exist, of course, if it is clear that respondent's claims [that were not fairly presented] are now procedurally barred under [the state's] law")). Thus, for exhaustion purposes, "'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" Id. (quotation omitted).

Here, New York's procedural rules bar Petitioner from attempting to raise Habeas Claim Two before the New York Court of Appeals, since he already has used the one direct appeal to which he is entitled. E.g., Cunningham v. Conway, 717 F. Supp.2d 339, 365 (W.D.N.Y. 2010) (citing N.Y. R. Ct. § 500.20(a)(2), (d); other citations omitted). Collateral review of Habeas Claim Two on a

motion to vacate the judgment also is barred because the issue was previously determined on the merits on direct appeal. <u>See</u> N.Y. CRIM. PROC. LAW § 440.10(2)(a); <u>see</u> <u>also</u> N.Y. CRIM. PROC. LAW § 440.10(2)(c) (barring review if a claim could have been raised on direct review). Accordingly, Habeas Claim Two must be deemed exhausted. <u>Grey</u>, 933 F.2d at 120-21. However, the procedural rule that leads to the constructive exhaustion of Habeas Claim Two also creates a procedural bar to this Court's review of the claim. <u>Id.</u> at 121 (citations omitted).

### C. The procedural default cannot be excused.

To overcome the procedural default of Habeas Claim Two, Petitioner "must show cause for the default and prejudice, or demonstrate that failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90 (2d Cir. 2001) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 748-50 (1991)). Petitioner, who insists that Habeas Claim Two is fully exhausted, has not attempted to demonstrate cause and prejudice, or to show that a fundamental miscarriage of justice will occur if this Court does not review the claim's merits. Accordingly, Habeas Claim Two remains subject to an unexcused procedural default, and is dismissed on this basis.

**MERITS OF THE PETITION'S EXHAUSTED CLAIM**

**I.   Admission of Petitioner's Statement in Violation of <u>Miranda</u> (Habeas Claim One)**

Petitioner asserts that after he waived his <u>Miranda</u> rights during the interrogation with Bielowicz, he then immediately and unequivocally invoked his right to remain silent. Therefore, Petitioner argues, the trial court should have suppressed his entire statement to Bielowicz. Petitioner contends that the admission of his statement was not harmless error.

**A.   Background**

On direct appeal, the Appellate Division rejected Habeas Claim One, noting that it was "well settled . . . that, in order to terminate questioning, the assertion by a defendant of his right to remain silent must be unequivocal and unqualified[.]'" <u>People v. Zacher</u>, 97 A.D.3d at 1101 (quoting <u>People v. Morton</u>, 231 A.D.2d 927, 928 (4th Dep't 1996); citation omitted; ellipsis in original). The Appellate Division went on to observe that whether a request to cease questioning is "'unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request[,] including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant[.]'" <u>Zacher</u>, 97 A.D.3d at 1101 (quoting <u>People v. Glover</u>, 87 N.Y.3d 838, 839 (1995); first brackets in original). Finding no basis for concluding that the suppression court's determination on this question was "unsupported by the

record[,]" id. (quotation and citations omitted), its determination therefore was required to be "granted deference[.]" Id. Accordingly, the Appellate Division declined to disturb the suppression court's ruling. The New York Court of Appeals then denied leave to appeal, as noted above.

**B.    Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), which governs Petitioner's request for habeas relief, "imposes a 'highly deferential standard for evaluating state-court rulings[.]'" Renico v. Lett, 559 U.S. 766, 773 (2010). It "'demands that state-court decisions be given the benefit of the doubt.'" Id. (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam); footnote omitted). When a petitioner "in custody pursuant to the judgment of a State court," 28 U.S.C. § 2254(d), advances "any claim that was adjudicated on the merits in State court proceedings," id., a federal court "shall not . . . grant[ ]" habeas relief "unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," id., § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id., § 2254(d)(2).

-23-

Although Petitioner mentions in passing that the state court's ruling was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[,]" 28 U.S.C. § 2254(d)(2), Petitioner does not make any specific argument directed to this claim. The Court accordingly finds that this argument under Section 2254(d)(2) has been waived. See, e.g., Nan Chen v. Holder, 359 F. App'x 254, 254 (2d Cir. 2010) (summary order) ("Issues not sufficiently argued in the briefs are considered waived . . . .") (citing Yueqing Zhang v. Gonzales, 426 F.3d 540, 541 n. 1, 545 n. 7 (2d Cir. 2005); other citation omitted).

Turning to Section 2254(d)(1), the parties do not dispute that the Appellate Division's holding, described above, constitutes an adjudication on the merits for purposes of 28 U.S.C. § 2254(d)(1). The Court will "assume without deciding" that the Appellate Division's rejection of Petitioner's Miranda claim "was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" thereby "satisfying the threshold demands for habeas relief" under Section 2254(d)(1). See Bauberger v. Haynes, 632 F.3d 100, 103 (4th Cir. 2011) (making assumption that petitioner satisfied Section 2254(d)(1)'s threshold requirements in order to "skirt the problems . . . associated with unnecessary constitutional decisionmaking" and "minimize the threat to good

-24-

adjudication that arises when courts enter into thorny constitutional areas . . . in fact-bound dispositions") (citing Pearson v. Callahan, 129 S. Ct. 808, 818, 819-20 (2009)). Making this assumption does not end the Court's inquiry, however, because "most constitutional errors can be harmless," including that of the kind the Court assumes occurred at Petitioner's trial. Arizona v. Fulminante, 499 U.S. 279, 295-96, 306 (1991); see also, e.g., Perkins v. Herbert, 596 F.3d 161, 174 (2d Cir. 2010) ("Miranda violations are . . . subject to harmless error review.") (citations omitted).

### C.   Applicable Harmless Error Standard

On direct review of a state court conviction, the appellate court must find a constitutional error "harmless beyond a reasonable doubt," Chapman v. California, 386 U.S. 18, 24 (1967), before affirming the conviction. On collateral review, a federal court may overturn a State conviction only when the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). In Fry v. Pliler, 551 U.S. 112 (2007), the Supreme Court held that collateral proceedings brought pursuant to 28 U.S.C. § 2254, "a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the [Brecht] standard . . ., whether or not the state appellate court recognized the error and

-25-

reviewed it for harmlessness under [Chapman]." Fry, 551 U.S. at 121-22 (citations omitted). Fry further noted that application the Brecht test "obviously subsumes," 551 U.S. at 120, an alternative test whereby a court would "assess whether the state appellate court acted reasonably in determining that the error was 'harmless . . . beyond a reasonable doubt'" under Chapman. Perkins v. Herbert, 596 F.3d 161, 174 (2d Cir. 2010). Accordingly, the Court must assess, under the Brecht standard, whether the error in admitting Petitioner's statements to Bielowicz "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 638 (quotation omitted); Fry, 551 U.S. at 121-22.

D.    **Application of Brecht**

In the particular context of assessing the harmfulness of Miranda errors, the Second Circuit has weighed "the importance of the wrongly admitted evidence, and the overall strength of the prosecution's case." Wood v. Ercole, 644 F.3d 83, 94 (2d Cir. 2011) (internal quotation marks, brackets, and ellipsis omitted). The importance of the evidence in question is "determined by the prosecutor's conduct with respect to the evidence, whether the evidence bore on an issue plainly critical to the jury's decision, and whether it was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." Id.

(internal citation, quotation marks, ellipsis and brackets omitted).

The Court turns first to a consideration of the importance of Petitioner's statement. Petitioner argues that by allegedly telling Bielowicz he "should not have hurt" his daughters, he undermined his defense of "not responsible by reason of mental disease or defect," because the statement demonstrated that he felt remorse and accepted responsibility for the stabbings. Petitioner made statements to the 911 operator that demonstrate his acceptance of responsibility and feelings of remorse and regret. Indeed, the first thing Petitioner said to the 911 operator was, "I just hurt my family." SR.121. He then repeated, "[I] [h]urt my family." SR.121. The operator inquired further as follows:

    O: Now you said you hurt your family?
    M: Yes[.]
    O: In what way?
    M: (yelling, crying) [T]hey got stabbed[.]
    O: What?
    M: They got stabbed.
    O: You got stabbed?
    M: They did. (Crying)
    . . .
    O: Okay, did you hurt them sir?
    M: (Crying) I'm so sorry. (Inaudible) (Crying)
    M: I'm so sorry, oh my God, oh, (crying) Oh my God
    (crying) (inaudible) Oh my god. I'm so sorry. I'm so
    sorry. I'm so sorry. (inaudible yelling), (crying) I'm so
    sorry (crying) I just don't know what happened, Oh my
    God, I'm so sorry, Oh my God, I'm so sorry. [W]hat did I
    do, (crying/yelling) oh, my baby, oh my baby, oh my God,
    what have I done[?]
    . . .
    M: I swear I did not know what I was doing. Where is the
    ambulance, I need help.
    O: David.

M: Hold on baby, hold on. Oh God, please hold on.

. . .

SR.122-123.

Moreover, because the 911 statements were made contemporaneously with the incident, they were more salient than the statement to Bielowicz to a determination of Petitioner's mental state at the time the crimes were committed. And the transcript of the 911 call does not support Petitioner's claim that he was still in what the defense expert described as an "emotional frenzy" wherein he "did not know what he was doing," T.9015-16. Although Petitioner was distraught during the 911 call, he had the clarity of mind to give his address and phone number and inform the operator of the nearest cross-streets to his house. SR.121. When the officers arrived, he told them, "Come in please[,]" and said, "You gotta help my baby." SR.123. Petitioner's statement to Bielowicz taking responsibility for hurting his daughters and expressing regret about his actions therefore was cumulative to the evidence of Petitioner's statements to the 911 operator indicating that Petitioner knew he had hurt his family and felt remorse about having done so.[8] Therefore, the Court finds that the factor

---

[8] The prosecutor's summation argument recognizes the cumulative nature of Petitioner's statements to Bielowicz. See T.9659 ("We know the defendant makes numerous spontaneous statements as he was crying on the 911 call. Now, ladies and gentlemen, he made another one. He told Sergeant Bielowicz, I shouldn't have hurt my daughters. What does that statement tell us? Again, he is responsible. . . .").

concerning the importance of the wrongly admitted evidence does not weigh in Petitioner's favor.

Petitioner also argues that his statement that he "should not have hurt" his daughters damaged his defense because he failed to express similar regret with regard to his wife. However, whether or not Petitioner expressed regret for stabbing Karelin simply was not material to the prosecution's establishment of the critical element of intent-to-kill. Moreover, the forensic and physical evidence overwhelmingly demonstrated that Petitioner did act with the intent to mortally wound Karelin. As the medical examiner testified, Karelin sustained six stab wounds in the area of her heart, as well as one stab wound to the back, and two stab wounds to the abdomen. One of the wounds to the upper right chest was "large and highly irregular," which indicated to the medical examiner that there had been "some movement while the object was in the wound." T.7596. In addition to sustaining multiple penetrating wounds in areas of her body containing vital organs, Karelin had a superficial incised wound with serrated markings on the front, right-side of her neck. The palms, backs, and sides of Karelin's hands contained a dozen sharp-force injuries which the medical examiner characterized as "defense-type wounds." The knife with which Petitioner conducted the assault on Karelin was found lodged in her thoracic spine and missing its handle. Removing the knife required "some considerable effort" on the medical examiner's part; the medical examiner

testified that embedding it in this manner "would have required substantial force." T.7656. In sum, the number, severity, depth, and location of Karelin's wounds (i.e., grouped or centered in the chest area) were highly probative of an intent to kill. See, e.g., People v. Collins, 290 A.D.2d 457, 458 (2d Dep't 2002) ("The number, depth, and severity of the wounds inflicted upon the victim belie the defendant's claim that he did not stab her intentionally . . . . In addition, the Medical Examiner testified that the multiple wounds on the victim's hands were consistent with defensive wounds, incurred when a victim tries to protect . . . herself from injury."). Likewise, H.Z.'s wounds were deep and grouped in the center area of her torso; seven were to her chest and one to her right abdomen. Any inference that the jury may have drawn with regard to Petitioner's failure to express regret to Bielowicz about stabbing Karelin was of minimal importance to the prosecution's case with regard to either of the first-degree murder charges.

The Second Circuit has emphasized that "[t]he strength of the prosecution's case, absent the erroneously admitted evidence, 'is probably the single most critical factor in determining whether [the] error was harmless.'" Wood, 644 F.3d at 94 (quoting Latine v. Mann, 25 F.3d 1162, 1167-68 (2d Cir. 1994) (internal quotation marks omitted in original; brackets in original; other citation omitted). The prosecution's evidence, apart from the wrongly

introduced statement, need not be "overwhelming," only "'weighty.'"
Glenn v. Bartlett, 98 F.3d 721, 729 (2d Cir. 1996) (quoting Samuels
v. Mann, 13 F.3d 522, 527-28 (2d Cir. 1993) ("In order to find the
[constitutional] error in this case to be harmless, we need not
conclude that the evidence against Samuels was overwhelming.")
(citation omitted), cert. denied, 513 U.S. 849 (1994)). Here, as
summarized above, the evidence supporting the prosecution's case
and negating Petitioner's insanity defense was more than weighty,
it was overwhelming. The Court has little doubt, let alone, a
"grave doubt," O'Neal v. McAninch, 513 U.S. 432, 437 (1995), that
admission of the statements to Bielowicz did not have a substantial
and injurious effect on the jury's verdict given the overall
strength of the prosecution's case.

## IV.   Conclusion

For the reasons discussed above, the Court declines to issue
a writ of habeas corpus. The Petition (Dkt #1) is dismissed. The
Court declines to issue a certificate of appealability because
Petitioner has not made a "substantial showing of the denial of a
constitutional right" pursuant to 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

S/Michael A. Telesca

_____
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     February 1, 2016
           Rochester, New York.